## BORLAND v. WALKER AND OTHERS.

1. It is no objection to a deposition that the interrogatories are prolix, multifarious, and double, but if the record is thereby unnecessarily incumbered, the offending party may be taxed with the costs thereby unnecessarily incurred.

2. An objection to an entire interrogatory, when part of it was proper, should be overruled.

3. When one in an insolvent condition, with judgments then in force against him, and others about to be obtained, sells to his father-in-law his entire estate, not reserving his household furniture—providing by the contract for the payment of only a portion of his debts, and giving a credit for the residue of the purchase money, the first payment of which was to fall due in seven and the last in about twelve years—as its necessary tendency is to hinder, and delay creditors, the law will presume such to have been the intention of the parties, unless the suspicious appearances are satisfactorily explained, and the contract shown to be *bona fide*.

4. If in such a case the vendee long before the payments are due by his contract with the vendor, commences paying the unsecured creditors of the latter, they giving indulgence, it is evidence that the contract was not real, and that there was a secret trust between the parties.

5. The retention of possession after an absolute sale of personal property, is evidence of fraud, though open to explanation, but is not sufficiently explained by proving a secret agreement between the vendor and vendee, that the latter should continue to control the property as the overseer of the former.

6. Where one charged as a *particeps fraudis*, is examined as a witness to prove the contract fair, he can expect credence to be given to his statements only by making a full and frank disclosure of all the facts. If he answer generally, or evasively, the Court will be authorized to infer that the imputation against him is well founded.

7. When a contract is void for fraud, it is void *ab initio*, and will not be allowed to stand as security to the grantee for advances he may have made, or responsibilities he may have incurred.

### Error to the Chancery Court of Lowndes County.

THE bill was filed by the plaintiff in error, and charges that in September, 1840, by an agreement in writing, the defendant Walker, sold to the complainant his estate, real and personal, consisting of lands and slaves, household furniture, and other articles of property for the sum of thirty-seven thousand dollars. Out of this sum the complainant agreed to pay a debt due the Bank at Montgomery, by Walker, amounting to about fifteen thousand dollars—to one Robinson, five hundred—the like sum to Cloughton & King—and to Bull & Files, three thousand dollars, which was to be paid out of the growing crop.

After these payments were made, the residue of the purchase money was to be paid to Walker, in six annual instalments—the first of which was to be paid in March, 1847, and the last in March, 1852—the five first being for $2,200, each, and the last for $2,000.

That since the making of the above agreement, the marshal and sheriff have taken and sold ten of the negroes, under executions issued on judgments obtained against Walker, of the existence of which he had no knowledge, and which Walker concealed from him at the time of the purchase. That other judgments have been obtained against Walker, on which executions have issued, and been levied on other of the slaves so sold, and on some of which he has been garnisheed as a debtor of Walker. It is also alledged that the complainant has

Borland v. Walker, and others.

paid all the debts which by the agreement he was bound to pay, and in addition has paid many others, which are set forth in the exhibit. That complainant was deceived by Walker, who induced him to believe that all or nearly all his debts were enumerated in the agreement—that he acted in good faith, and that his purchase has been beneficial to the creditors, by saving the property from sacrifice.

Walker and the execution creditors are made defendants. The prayer of the bill is for an injunction to the creditors proceeding at law, and for relief in the alternative, viz: That the unsatisfied creditors of Walker be decreed to elect either to reimburse to the complainant the moneys paid by him, and that the sale be rescinded and the property be declared subject to their demand and sold, or that the complainant be subrogated to the rights of those creditors, whose debts he has paid, and have the same *lien* on the property, to which they were entitled, and that the property be sold to satisfy the same; or that the creditors be decreed to wait for the payment of their debts until the instalments on the purchase fall due, to be paid into Court, and distributed among the creditors as the Court may direct.

Appended to the bill as an exhibit, is the agreement described in the bill, signed by complainant and Walker, in substance as described in the bill. After the signature is a memorandum to the following effect: "P. S. And another note payable on the 1st of March, 1852, for two thousand dollars; this 27th day of Sept. 1840."

The creditors answer, and deny the validity of the sale—insisting that it was made with the intent to delay, hinder, and defraud creditors—that there has been no real change of the possession of the property, since the pretended sale, and that it is fraudulent and void.

Walker in his answer, in effect, admits the material allegations of the bill. Much testimony was taken on both sides which need not here be set out, as it is recited in the opinion of the Court.

The cause coming on to be heard, objections were taken by both parties to the testimony adduced by each. The decision of the Chancellor upon such points as can be here reviewed, will alone be stated.

The complainant objected to the defendant's testimony on the ground that the interrogatories were prolix, double, multifarious, and incapable of being crossed. The Chancellor overruled the objection, because too general, and because it did not specify and point out the objectionable matter.

The complainant also objected to the 12th interrogatory for irrelevancy, which was overruled.

The defendants (except Walker) objected to the testimony of Walker, which had been taken in the cause. The Chancellor considered that Walker had a direct interest in the litigation, was a proper party defendant, but that being interested, he could not be examined as a witness—the more especially as he was concerned in a transaction impeached for fraud. And further, that the fact that he was a certificated bankrupt, did not restore his competency—he accordingly suppressed his testimony. And after an examination of the evidence, considering it as establishing the defence, and that the contract was fraudulent in point of fact, dismissed the bill.

These matters are now assigned as error.

WILLIAMS, for plaintiff in error—cited 1 Vernon, 465; 2 Id. 678; 2 P. Wm's, 203; 2 Vesey, Jr. 516; 1 Johns. Chan. 478.

R. SAFFOLD, contra. The testimony of Walker was properly suppressed, because he had an interest in the result. [2 Paige, 24, 54; 1 Hop. 488; 1 Hoff. C. P. 485, rule 73.] By making a material defendant a witness complainant forfeits all right to a decree. [1 Cox Cases, 344; 9 Mod. 438; 1 Beatty's Rep. 356.]

The bill is multifarious and is neither a creditor's bill or a bill of peace. [2 Story's Eq. 147, 151–3; 1 Atk. 282; 2 Id. 391, 483.]

The entire transaction is fraudulent as shown by the contract and the testimony. [4 Ala. Rep. 374; 14 Johns. 458; 4 Id. 536; 8th Dana, 263; 4 Days, 146; 13 Pet. 101; 2 Id. 107; 2 Ala. Rep. 313; 3 Stewart, 243; 20 Johns. 442; 1 Hop. 373; 2 Mason C. C. R. 252; 11 Wend. 187; 4 Paige, 23; 9 Porter, 566; 16 Wend. 523; 17 Id. 53; 7 Paige, 163; 20 Wend. 507; 9th Johns. 337; 7th Cowen, 732; 5 S. & R. 275; 2 Kent's Com. 412; 6 Rand. 285; 2 Stewart 50, 336; 3 Ala. Rep. 444; 5 Id. 531.]

Borland v. Walker, and others.

ORMOND, J.—There are some questions presented on the record arising on preliminary points, decided by the Chancellor against the plaintiff in error, which it is proper should be first considered. The complainant objected to the depositions of the defendants, upon the ground, that the interrogatories were prolix, double, multifarious, and incapable of being crossed. The Chancellor overruled the objection on the ground, that it was not sufficiently specific. It is not easy to perceive how the objection for prolixity could have been otherwise stated, but we apprehend that it is no objection to a deposition, that the interrogatories were prolix, though if the record was thereby unreasonably incumbered, the offending party might be taxed with the costs thereby unnecessarily incurred. The same remarks apply to their being multifarious and double, which, if it does not mean the same thing, must mean that irrelevant matter was introduced. If such were the fact, it would not vitiate the answers to such parts of the interrogatories as were relevant, and the objections to the entire depositions for this cause were therefore properly overruled. The objection, that cross interrogatories could not have been framed upon the interrogatories, we think has no foundation in fact.

The 12th interrogatory was objected to for irrelevancy. It consists of an inquiry, whether Walker was not reputed and believed to be insolvent in his neighborhood, or greatly embarrassed, at the time of making the contract. Whether Borland was not seriously in debt at the time; more than his income would pay for several years—and whether at the time the contract was made, it was not ascertained that a very short crop would be lmade.

Conceding that evidence of the embarrassment of Walker unless known to Borland, would have been irrelevant, it is clear that the residue of the interrogatory was pertinent. The embarrassed condition of Borland would tend to establish the fraud by showing his inability to make such a purchase, and the prospect of the failure of the crop by diminishing his means have the same effect. What weight the evidence would be entitled to we need not now consider. The objection being to the entire interrogatory was properly overruled. It is proper however, to say, that the answers to the first part of

35

the interrogatory do not appear to have influenced the opinion of the Chancellor, and have not been considered by us.

The question which arises upon the rejection of the evidence of Walker, the grantor, is one of more difficulty. The rule of Chancery practice is clear, that a defendant may be examined touchiug any matter in litigation in which he has no interest. One object of the bill was, to obtain a rescission of the contract. To the bill, in this aspect, he was a necessary party, having a direct interest in the event. The bill further prays, that the complainant may be subrogated to the rights of those creditors of Walker whose debts he has paid. As between the complainant and the creditors the interest of Walker was balanced, as has always been held in this State, in the analogous case of trials of right of property where the contest is between the creditors and the beneficiary claiming under the deed made by the debtor, and this, although the deed may be impeached for fraud. We shall therefore, for the present, decline the decision of this question, because in addition to the reasons already adduced, the testimony of Walker, the vendor, does not in our opinion vary the result.

The contract which we are now to consider was before this Court in the case of the P. & M. Bank v. Borland, 5 Ala. Rep. 531, and we there held, that the contract on its face was not fraudulent. It was then considered without reference to any extrinsic facts, but the question is entirely different when presented in connection with the facts now disclosed. The case now presented is that of a man in an insolvent condition, with judgments in force against him and others impending over him, selling his entire estate, not reserving even his household furniture, to his father-in-law ; providing for the payment of a portion only of his creditors, and giving a credit for the residue of the purchase money, payable in instalments, the first of which was not to fall due for near seven years, and the last postponed for near twelve years. This has very much the appearance of a design to hinder and delay creditors; it is manifest that it has that effect. Where such a contract is made between a father-in-law and son-in-law, those suspicious appearances acquire increased strength, and demand a full and satisfactory explanation, showing that the transaction is *bona fide.* Aware

of this, the allegations of the bill are designed to obviate these objections, and to show the fairness of the transaction.

The bill charges that Walker, the vendor, deceived the complainant at the time the contract was made, by concealing from him the amount of his debts. The allegation is as follows:

"He further represents, that if he had known that said Walker was indebted to the extent that he has since ascertained, he would never have entered into said contract; and that if he had known of the judgments existing against Walker besides those in favor of said Bank, he likewise would have refused to make said purchase. But he believed that the judgments in favor of the Bank were all the judgments against him, and that the enumeration of debts in exhibit A. comprised all, or nearly all of the debts of the said Walker; and that he was satisfied that all and every of the debts of the said Walker did not amount to more than the amount of the purchase money aforesaid. He further believed that he could settle with the creditors of Walker without suit or expense to himself, and without loss or injury to them; and he avers that he has done so to the satisfaction of said creditors to the amount before mentioned."

These important allegations are very unsatisfactory and incongruous. In the first branch of the sentence it is stated that complainant supposed, and believed, that the debts of Walker enumerated in the contract, and which complainant undertook to pay, (amounting to about $20,000,) were all, or nearly all, the debts Walker owed, and that acting on this belief he made the purchase. In the succeeding part of the sentence, it appears, that he there supposed it probable that it might consume all the purchase money to discharge the debts of Walker. When it is considered that by the contract no part of the large residue was to be paid until March, 1847, and the last instalment not until March, 1852, it will be at one perceived that the creditors of Walker, not provided for in the contract, would be wholly in the power of the complainant. The complainant in making this allegation is doubtless stating it as strongly as possible in his own favor, yet it can be understood in no other light, than that he expected the creditors not provided for, should be paid out of the residue, and that they

would consume it. They were then, some of them, to wait near twelve years for their debts, and none could obtain payment for near seven years; yet he says, he expected " he could settle with the creditors (not provided for) without suit, or expense to himself, and without loss or injury to them."

But why, it may be asked, did he expect to have any thing to do with the creditors of· Walker? If the contract was *bona fide* the large residue was to be paid to Walker, and the expectation here admitted to exist when the contract was made, that the money was not to be paid to Walker, but was to go to the creditors of Walker in payment of their debts, is, if not an admission, quite an intelligible intimation, that complainant was to make terms with the creditors for the payment of their debts.

Accordingly we find that the complainant, since the purchase, although the first instalment is not yet due, has made arrangements for the payment of a large amount of the debts of Walker, which he was under no obligation whatever to pay, unless there was a secret trust that he should do so, amounting in all, as alledged, to upwards of nine thousand dollars. One of the debts thus paid may suffice as an example.

Walker was indebted to Greenwood & Rochelle by note, which was put in suit in August, 1840, a short time before the contract was made between Walker and complainant. Having obtained judgment, and being unable to make the money on their execution, one of the firm called on Walker to know what arrangement he had made for the payment of the debt. Walker informed him that he had sold out for the purpose of paying his debts, having discovered that his property, if sold under the hammer, would not pay them, and that he would make an arrangement through Borland for the payment of the money. The arrangement was made by taking Borland's notes due 1st January, 1842 and 1843, for the amount of the judgment, and including a debt which had become due since the date of the contract between Borland and Walker. These notes were not paid at maturity, but put in suit, and upon one the money had not been paid when the evidence was taken.

Here we see distinctly the consummation of the scheme, which evidently was, by the postponement of the payments to a distant period, to coerce the creditors into arrangements for

the payment of their debts at a future time; and thus while the property was placed beyond the grasp of the creditor, to compel him to wait until by the receipt of the crop his debts could be paid. If the transactions were real, can it be believed that the complainant would have anticipated the payment of a large portion of the purchase money eight or ten years? Such is not the conduct of men in the ordinary transactions of life, and the departure in this instance can only be explained upon the hypothesis, that the sale was not real, and that there was a secret trust between the parties.

The conduct of the parties to this transaction at the time it was entered into, and subsequently, in addition to what has been stated, demonstrates the correctness of this conclusion.

The instrument by which it is evidenced, when considered in connection with the facts, is of a suspicious character, not only from the unusually long credits given for the purchase money, but also because a portion of the purchase money was not provided to be paid at any particular time; nor do any notes appear to have been executed: The sale is not attended with the usual consequences attending real transactions of that magnitude. No notoriety whatever appears to have been given to it. No change takes place in the government or conduct of the plantation—the same slaves continue to cultivate the same land, although the complainant has a plantation in the immediate vicinity. The vendor appears to the world, still to be the owner; he lives in the same house—his family ride in the same carriage—they are waited on by the same servants—and he appears to the neighbors to be exercising the same acts of ownership over the place as before the sale, and still appearing to derive his support from the plantation as the proprietor. The conveyance is of all the property, real and personal, household furniture, &c.

To repel the presumption which the law makes in such a case, the complainant proves that he employed and paid two overseers for a short time; that he employed and paid a physician for attending to the slaves; and to account for the interference by Walker, and control exercised by him over the property, after the sale, proves by Walker himself that he employed and paid him as overseer. No reason whatever is given for permitting Walker after the sale to retain possession

of the household servants, carriage, furniture, &c. except that they were left for the use of the family, and that in 1842, they were conveyed by deed in trust for the benefit of Mrs. Walker and the family.

Since the decision in the case of Hobbs v. Bibb, 2 Stewart, 54, it has been the settled law of this Court, that where there is no change in the possession, after an absolute sale of personal property, it is evidence of fraud, unless satisfactorily explained, and shown to be *bona fide*. What will be sufficient evidence to explain the apparent discrepancy of the possession not accompanying the title, cannot be reduced to any fixed rule. It must however be such, as to demonstrate to the Court or jury trying the fact, that notwithstanding possession has not accompanied the transfer of the title, the sale was really made, and the title transferred.

In our opinion the facts relied on by the complainant to repel the presumption of fraud are not sufficient, especially in a case where from the intimate relation between the parties, a secret trust might be presumed more easily than between strangers. As it respects the house servants, carriage, &c. no reason whatever is given, but that they were left for the use of the vendor. Nor do we consider that the proof of ownership exercised by the complainant over the plantation and slaves, shows any thing more than a colorable possession. There does not appear to have been any actual, real, change of the possession. If the secret agreement between the vendor, and vendee, that the latter should continue to control the property as the *overseer* of the former, was sufficient evidence of change of possession, there would be no security whatever left for creditors.

The testimony of Walker, the vendor, does not vary the result we have attained. He is charged as a *particeps fraudis*, and although competent to testify, is certainly a suspicious witness. He admits his embarrassed condition when the contract was made, and that he has since become a bankrupt—that the sale was made to enable him to pay his debts—that the long time was given that the property might bring the best price possible. Admits that the debts paid by complainant for him not provided for in the contract, were paid at his request. In answer to a searching cross interrogatory, whether he

did not derive his support from the plantation as before the sale, and if not, to state how he obtained his support—he says, that he does not derive his support from the plantation *as formerly*—and that he "supports his family in an honest way." A witness placed in the condition of this, can expect credence to be given to his statements only upon his making a full and frank disclosure of all the facts of the case. The creditors alledged that the sale was fraudulent—that he still derived his support and that of his family, from the plantation and slaves, which he pretended to have sold. In the condition in which he had placed himself, they had a right to know what were his resources, and it was his duty to disclose them. By omitting to do so, and by answering generally, and evasively, this Court must come to the conclusion that the imputation is well founded.

The declarations of the complainant to different persons after the purchase, shed a strong light upon the transaction, and demonstrate its true character. To the witness Lowe, he declared, that at the time he purchased the property he thought he could by putting his own force with it, pay off the debt, and save the property, but that he would now give any one five thousand dollars that would take it off his hands. To Kelly, that he had purchased the property to try to save it—that if the creditors of Walker, should sue him they would tear him all to pieces, but he thought he could pay the debts by getting indulgence. Several of the witnesses prove, that he admitted that he had obtained time by giving his own notes in the place of Walker's; and others, that he bought the property to try to save it for his daughter.

These declarations are utterly inconsistent with the idea of a *bona fide* purchase of the property; but entirely agree with the supposition that it was an attempt to shelter the property from legal coercion, and thereby to gain time for the payment of the debts from the avails of the plantation.

Nor do we think it possible to doubt, that the complainant knew at the time of the purchase, that Walker was greatly embarrassed, beyond the debts enumerated in the schedule, if not insolvent. As already stated, the bill concedes in not very equivocal terms such knowledge—the declarations of the complainant to Lowe and others, in distinct terms admits it; and

the relationship of the parties, and the residence on adjoining plantations, renders it to the last degree improbable, that the complainant should have no intimation, of what every one else in the community knew.

We have thus attained the conclusion that this contract was made with the intent to hinder and delay creditors, and it is therefore fraudulent and void. It is however insisted, that the complainant is entitled to a *lien* on the property, to the amount of the debts of Walker paid by him.

The contract being void for fraud, no right which can be enforced in Chancery can grow out of it. If this pretension were allowed, there would be no risk whatever in making such contracts as this, as the fraudulent actor would at all events receive a credit for what he had paid out. The established rule of the Court of Chancery, is, that where a deed is void for fraud, it is void *ab initio*, and will not be allowed to stand as a security to the grantee for advances he may have made, or responsibilities he may have incurred. [Sands v. Codwise, 4 Johns. 536; Bean v. Smith, 2 Mason 252.]

The case of Cummings & Cooper v. McCullough, 5 Ala. Rep. 324, relied upon by the counsel for the plaintiff in error, is entirely dissimilar. There, although a deed of assignment was declared void for fraud, the trustee was allowed a credit for all payments which he had made to the creditors of the grantor, before the filing of the bill, from the avails of the *choses in action* of the grantor, expressly upon the ground that the other creditors were not prejudiced thereby, as the trustee had merely done, what the debtor himself could have done, if the deed had never been made. That although the deed was void as to creditors, it was an authority from the grantor to the trustee to pay the debts; and so far as they were paid by the trustee, before the bill was filed, from the funds of the debtor, upon which the creditor had no *lien*, legal or equitable, he could not be prejudiced.

Not so in this case; the contract was the instrument by which the property has been kept from the grasp of the creditor. This being fraudulent, there was no right to receive the proceeds to the prejudice of any creditor, and it is therefore no answer to the defendants to this bill that other creditors have been paid from the produce of the estate—that, if it be

true, will not discharge their debt, which but for this contract, might long since have been paid.

It may be that the complainant and Walker did not suppose that by the contract they were making, they defrauded any one; or indeed that by placing the property beyond legal coercion for the space of twelve years, its product would during that period pay off all the debts, when, if forced into market at sheriff's sale, it would be insufficient for that purpose. However, this may affect the question in a moral point of view, it does not change its legal aspect. Such an interference with the right of the creditor, the statute of frauds pronounces fraudulent and void; and it can, we think, admit of no doubt, that the highest interests of this community are best supported, by a firm and energetic enforcement of its provisions.

Let the decree of the Chancellor be affirmed.